Yellow light comes on, red light, and you may stop speaking unless you have, you can finish your sentence unless you're answering the court's question, and please give us record citations when that is appropriate. First case of this morning is number 16, 20650, Dean v. Phatak, and we'll hear first from Mr. Helfand. Good morning, and may it please the court, William Helfand for Dr. Darshan Phatak. Although I'm prepared to address any issue that's contained within the briefing, what I'd like to do in the brief time that I have this morning is address the two-part analysis of the question of qualified immunity, because as this Court recently held in an opinion authored by Judge Higginbotham, Brewer v. Hain, which was cited in a letter brief after the briefing in this case in light of the fact that it was decided after the briefing was completed in this case, the propriety of qualified immunity on both elements is so clear here, respectfully even more so than it was in the Brewer case, that I'd like to focus on that in the time that I have. First, as the record demonstrates, the appellee was arrested based upon a probable cause warrant that was issued by an independent magistrate, which was based upon the affidavit testimony of a Houston Police Department detective who testified that he would have sought the same arrest warrant in the absence of any information from the medical examiner's office based upon significant evidence suggesting probable cause for Mr. Dean's arrest, apart from the medical forensic testimony, I'm sorry, medical forensic evidence. The appellant's burden under this circuit's precedent in Quadra, which is first cited the brief at page 42, Quadra v. Houston ISD, is to demonstrate that the independent magistrate would not have issued that warrant in the absence of information regarding Dr. Faddock's medical opinion, that the appellee has wholly failed to do. But even if the court were to wonder about what the judge who issued the arrest warrant would have done, the court need look no further than the grand jury indictment, and the undisputed record evidence that Dr. Faddock was not called to testify, and that there is no evidence any information from his medical forensic report, including his medical opinion of homicide, were presented to the grand jury. Wait a minute, I don't recall, I do recall, I thought your brief was pretty carefully worded on that point to say that Dr. Faddock never appeared, but surely the results of the medical examination were before the grand jury in some way or another. We have no evidence of that, Your Honor, from the prosecuting attorney or from any other record. Now keep in mind, as the court may have observed, that between the time of the district attorney's decision not to prosecute Mr. Dean and the time that Mr. Dean brought a lawsuit, he moved the state district court to expunge the records relating to his prosecution. And while this court doesn't apply any type of a spoliation rule to an affirmative effort to destroy the evidence that would speak specifically to his claims, some courts have found that appropriate. And it is a curious situation indeed when the plaintiff, now appellee, chooses to destroy the records and then proceed with a prosecution having disarmed the defendants, including Dr. Faddock in this case, from the ability to find the answer, for example, to Your Honor's question. But standing alone, without the benefit... You're saying that an expungement equals absolute destruction of every record in connection with the criminal prosecution? Yes, Your Honor. That's my understanding and that's certainly... You're destroyed. Yes, Your Honor. It is not available. It is destroyed. I'm not aware of anyone who retains that record other than the record of the... Record of what? I'm sorry, Your Honor? Who retains the record. What record are you talking about? Well, in this case, we have the records of the defendants pursuant to the expunction order. And so to Judge Jones's question, what was presented to the grand jury, there is no... Any medical examiner records would be destroyed, district attorney's office records would be destroyed, defense attorney's records would be destroyed. No, Judge, that's an excellent point, right, is that the criminal defendant, in this case the plaintiff appellee, is not obligated to destroy his own records, but when asked to present them, he did not have them in this case. Now, I don't know to what extent he would... He would have... I'm not a criminal defense lawyer, Judge, so I don't know to what extent he would have the record of the grand jury proceedings. And I don't know whether there would even be an indication, if he had those records, of what was presented to the grand jury. But to Judge Jones's question, this record before the district court, and therefore here on appeal, is devoid of any evidence whatsoever that Dr. Faddick's opinions were presented as part of the presentation to the grand jury. And to be sure, under Quadra, in order to prove the first element of the qualified immunity analysis, that is that there was a constitutional violation, it is the appellee plaintiff's burden to present evidence that Dr. Faddick did something to corrupt the grand jury's indictment. And that he wholly has failed to do. There is simply nothing before the court on that. And if, Your Honor, Judge Jones, if you inferred from my writing that there was some effort to parse or carefully word that, it was certainly not intended. Dr. Faddick's testimony is he did not testify and had no information his report revealed. I understand that, but I wouldn't be... I mean, I don't know how grand jury would necessarily infer anything nefarious from this, because after all, you've been tried once and a hung jury, you've been tried a second time and let off, so you do . . . any person, even if they weren't going to sue anybody, would want the records expunged. But I don't know whether a grand jury . . . I would just assume they would normally have a report like that, even though the doctor . . . and if they wanted to call Dr. Faddick, they could call Dr. Faddick, but it seemed to be incriminating. Well, it certainly is a piece of a significant puzzle, to use the detective's term, of incriminating evidence. Well, they say it's the most important piece, but, you know, that's argumentation, of course. And, yes, Your Honor, in fact, you just made the very point that I would make, which is I understand that because Dr. Faddick is the sole remaining potential defendant in this case, it has now become the sine qua non of his indictment, but the problem with that is it's merely argument. And this Court has repeatedly made clear that it is the plaintiff's burden to disprove immunity, which is otherwise presumed. And so that being the case, the plaintiff must do more than simply ask the Court to imagine that this potentially damning evidence was found. The . . . even if the Court were to demur on that issue, the Court can still find, and indeed I would respectfully submit must find, under the Brewer v. Hain decision, in which Judge Jones also participated, that qualified immunity clearly applies here. And it's found simply in the appellee's own briefing. The appellee addresses two points in his briefing. The first is limitations. I won't take up the Court's time with that today. But the second is the plaintiff's, the appellee's contention regarding the alleged constitutional violation. And read at its broadest, and read at its most generous, the appellee complains that Dr. Faddick did not do what the appellee alleges, but does not prove, was a necessary medical forensic test, and that is this side-by-side comparison. And, in fact, that's exactly what the introduction to the appellee's entire argument on the question of a constitutional violation is. The problem with that is, again, there is absolutely nothing, not one thing, in the record before this Court that demonstrates the propriety of the appellee's assertion that the side-by-side comparison was required. To the very contrary, the Court has an undisputed record that the side-by-side comparison is one which a forensic pathologist may consider, may utilize, but no standard directs him or her that it is required to do the work that Dr. Faddick was doing. And in that regard, we find that not only did Dr. Faddick's supervisor approve Dr. Faddick's medical opinion, not only did the chief medical examiner for Harris County then also approve both Dr. Faddick's opinion and the means by which he utilized to reach it, but the appellee's own expert, Dr. Joyce Carter, the former Harris County medical examiner, did not raise, did not question Dr. Faddick's methods or medical opinions when she testified in the criminal trial, nor in this record. Now, the Court will find it record pages 77, 18, and 19. Indeed, Dr. Carter could have acknowledged that she could have and chose not to do a side-by-side comparison to provide her own testimony on behalf of the appellee, both at the criminal case and in the civil matter. She was deposed in the civil case? I do not recall whether she was deposed in the civil case. I do know this, Your Honor, to that point. When this side-by-side contention came up in the district court in this case, Dr. Faddick's trial counsel asked for the opportunity to propound written discovery and to take Dr. Carter's deposition on that point. The written discovery is in the record. I'm sorry I don't have the record, so I can provide it if the Court would like. But the written discovery was interrogatories, requests for production, and requests for admissions, all aimed at an identification of the basis for the allegation that a side-by-side comparison was as the appellee now claims require. That written discovery demonstrated that the appellee could not present any basis for that assertion. Dr. Faddick's trial counsel asked Judge Bennett for the opportunity to take Dr. Carter's deposition. The record demonstrates that Judge Bennett said he would allow the deposition on that point if the appellee intended to present Dr. Carter to urge that point under 702. Appellee then contacted Dr. Faddick's trial counsel and said that he did not intend to use Dr. Carter to present that testimony. The record is clear. No doctor has espoused the assertion or stood by the plaintiff's pure allegation that this side-by-side comparison was required. So... You have the testimony from the first trial, right? You do. And what you have in there, at record pages 4250 and 51, that Dr. Carter chose not to do a side-by-side comparison herself. And as I said, at record pages 7718 and 19, Dr. Faddick did not testify at the trial. She testified about her own opinion about whether this could be properly classified as a homicide or a suicide. Based on what? I mean, not just the autopsy, but all the rest of the evidence together? Right. As the Court may recall, Mr. Dean was found to have gunshot residue on his hands, but the decedent did not have any gunshot residue. There was an effort to explain why the decedent had no real significant blood on the hand that supposedly was holding the gun that fired the weapon. So Dr. Carter was called generally to speak to the forensic evidence. She was asked... Would you be willing to concede that the question of whether or not the doctor created a false report is immaterial? Because you seem to be saying even if the report was false, it just doesn't matter because it was never used. I wouldn't say that. It wasn't used for the indictment, as far as we know, in the record. And I couldn't concede that it's a matter of immateriality if there was a knowing falsehood. I don't, I don't, I wouldn't want to be heard to say that. But what I would say, Your Honor, is that... Well, isn't that what the District Court focused on, whether or not he falsely created a record and said that there was a genuine issue of material factors of whether or not he did that? You seem to be saying that's immaterial. It wouldn't matter what was in that report, whether it was true or false, if the report absolutely was not used and had nothing to do with an arrest or a prosecution. That seems to be your argument. Well, no, I apologize, then, if I haven't been eloquent enough, Judge. What I'm saying is that the report, what's in the report doesn't matter if it wasn't presented to the grand jury. And the record before this Court does not indicate it was presented to the grand jury. But once you're, once the Court may, if the Court gets past the quadra issue or chooses not to address it, as it relates to the question of qualified immunity, whether there was a constitutional violation and whether it violated, whether the conduct... He testified at trial, didn't he? I'm sorry, Your Honor? He testified at trial. Yes, but the trial court correctly recognized that he's entitled to absolute immunity for his trial testimony. And so that's not, that's not currently... Even if it's deliberately false. I'm sorry, Your Honor? Even if it's deliberately false? I'm having difficulty hearing you, Your Honor. Even if it's deliberately false? Well, yes, that's actually both Supreme Court and this Circuit's precedent, that trial testimony is insulated by absolute immunity. But, but if I, may I answer Judge Gray's question, Your Honor? Yes. Thank you. Just as in Brewer... He testified at the trial, but what it backs up to, it goes back to this earlier report. He testified at trial to what was in that earlier report, right? So that, what he said at trial is going to tell us exactly what was in that earlier report and certainly that's not protected. Well, and that's, I think, Judge Higginbotham, if I can answer... I'll say it another way. If you file a false report, let me see, if we assume that, before trial, and that is a moving force to push the case to trial, that you get on the stand and testify to it, it doesn't insulate you, or does it? Well, the... A trial testimony may not be of strong protections with court witnesses, but I don't know that it's going to give you insulation to the earlier report. That's my suggestion. And if I could speak to Your Honor's question, and I think I'll be able to answer Judge Gray's question, is the problem with that, with, with, Your Honors, Judge Higginbotham's hypothetical, and to speak to Judge Gray's question, is there is no evidence in the record that this is a false report. There is evidence in the record which, which, appropriately, the Harris County Medical Examiner, including Dr. Faddick, acknowledged was an error in medical judgment, and of course the amici speak directly to that. There is no requirement to do the test that the appellee claims, and if there's no requirement to do the test that the appellee claims, then Dr. Faddick has done no more here than made a mistake, and we don't hold people liable for violating the Constitution for a mistake. Well, he has a requirement to do some autopsy report as a medical examiner. He's required to do that, isn't he? He is required to do that, and there's no dis- He has an obligation to be honest about what he includes in his report. You'll agree with me on that, wouldn't you? I, absolutely. But he's also entire, entitled to an honest mistake, Your Honor, and that's what this Court confronted in Brewer. But that's what the question is, and that's what the district court said is the reason there's a genuine issue of material fact. The question is whether or not he created a false report or just made some honest mistake. And I respect that, and I respect the district judge who made that statement, but the problem is the statement is made in isolation of the evidence. There has to be — the trial court did not point this Court or the parties to any evidence that underpins that assertion. It is correct to say that that's the question, but today, before this Court, the question is, in answering that question, where is the evidence? And I feel very comfortable telling the Court there is none. All right. You have time for rebuttal. Thank you. Mr. Gallo. May it please the Court. Counsel. Dr. Fittek falsified his autopsy report. He falsified it by saying the gun was in the non-suicide position, and that's how, throughout the record, we utilize the term. If it was If that were so obvious, then why didn't your defense expert, Dr. Joyce Carter, for all I know, a very well-respected former medical examiner in Houston, why didn't she say that in the first trial and relieved your client of the necessity of a second trial? I was not involved, obviously, in that trial. I don't care who was involved. I understand that. And if it's so obvious and required by a medical practitioner, and the only thing that makes this thing false, then Dr. Carter, it seems to me, would have recognized this. Or did she make a false mistake, too? No. I don't know that she analyzed it one way or the other. Well, that's the point, isn't it? Because what you're trying to do is transform medical negligence into deliberate falsehood. And if he's an M.D., even on a dead person, you can be liable for malpractice but not be liable for an intentional tort. Correct. So how do you get there? The way we get here judges this. Detective Waters, at the end of his interrogation of my client, said, whether that handles up or down determines the whole case. Dr. Fatak, in his deposition, said, handle up or down determines the entire case. For all the other things that the defense tries to point to that Dr. Fatak could have relied upon, his own testimony tells us it's handle up or down. What was in the first criminal trial about handle up, handle down? Well, Dr. Fatak attested that it was handle up. I understand that, and I'm sorry I haven't gone into the transcript of the first trial, but if that was the critical evidence, it seems to me it would be hammered home by the prosecutor, it would be in the closing argument, it would be in the opening argument. I mean, aside from all the other circumstantial evidence in the case, you know. Right. It was hammered by the prosecutor and the ball was dropped by the defense. That's my interpretation. You didn't cite all that in your brief, so I was having a big problem with that. Okay. But going back to your question of how do we get there from here, first of all, the fact is once Dr. Wolfe did his comparison, it was obvious that the gun was in the suicide position. Dr. Wolfe testified to that. Dr. Fatak testified to that, that he was 180 degrees wrong. And I understand what the court's saying. Now it comes down to did he do it on purpose or grossly negligently, or was it just an honest mistake? Because Dr. Fatak himself said, the detective said, Dr. Wolfe said, handle up or handle down decides whether this is a homicide or a suicide, period. Now you say, well, that's just one honest mistake. Well, the second one that he did is not an honest mistake. Dr. Fatak, to help Detective Waters, who desperately wanted my guy prosecuted because under Detective Waters' own statements, black women don't commit suicide, ergo black men must kill them. That's how this whole case started out. That's not in your brief either. I understand, but it is in the record, and it was in the record before the trial court. Well, you know, you could have saved us a lot of time if you put all the damning evidence and what you claim to be the damning evidence in your brief, but anyway. All right, and so as we go forward from there, what is in the record and is in our briefing is they had to struggle with the idea of how does somebody just lie on a bathroom floor and allow another person to put a gun up to the side of their head and pull the trigger? They were drunk as a skunk. Well, and I'm glad you raised that, Judge, because they had to make her drunk as a skunk. And Dr. Fatak, in order to make her drunk as a skunk, did his blood alcohol level testing by using vitreous fluid from the eye rather than using blood alcohol from the blood. A curious thing. In fact, Dr. Wolf, and this is in the record, testified. Now, this is the man who reviewed the report and said it was okay, even though it didn't have a BAC in it, didn't have a blood alcohol. It had a vitreous blood alcohol. And Dr. Wolf testified in the record at 84, 75, and 76. He found that Dr. Fatak saying that's the thing you want to do is get the vitreous fluid to be a surprising, surprising statement. He also said, Dr. Wolf, that Dr. Fatak was going to be talked to about that after this case was over, not before, but after. Dr. Fatak acknowledged in his deposition that he got told. Is it significant because it can result in a false high reading? It's significant in that we have a guy who absolutely knows better than to use vitreous fluid is for some reason in this particular case using it because it does have a false high reading. Again, I didn't read your brief. Your brief has a bunch of innuendo about that, and maybe it's just the way it's written, but the brief doesn't seem to me. The evidence also was that her friends had put her to bed, right? At earlier times in the night. Well, about an hour and a half earlier to be precise because that's when Mr. Dean went out of the house to take his friend home. Correct. So she seems to have been passed out an hour and a half. I mean, again, I haven't read the trial record. I understand she was put to bed, and I'm not disputing that the young lady was drunk, but she wasn't so drunk she would lay on a bathroom floor and let somebody put a gun to her head and blow her brains out. There's nothing in the record about that. So you couple that with, and Judge Higginbotham, you raised this. Then when Dr. Fatak went to the trial court, his testimony, especially in the second trial when there was a very good trial lawyer cross-examining him, his testimony was riddled with contradictions. Now, I don't disagree with counsel. Those in and of themselves are not a basis. That's absolute immunity applies to that. But the trial court was certainly free to consider that information in addition to the vitreous loot, in addition to the gun. But, you know, what really influenced me in looking at the briefs and Judge Bennett's opinion here was Judge Bennett did not seem to be reciting evidence. He seemed to simply be reciting the allegations in your complaint, and we did do a little bit of work to try to tie those allegations to the evidence, and we were not having much effect. So, I mean, rightly or wrongly, it appeared to me that Judge Bennett was relying mainly on your allegations because he didn't recite all this evidence, nor did your brief that you alluded to. But even the vitreous, even the blood alcohol was still way high, normally high. Well, Judge, and perhaps I read his order differently than you, but, one, he cites as a matter of law that there have to be facts to support the concept, that it's not the same as the motion to dismiss. Well, I understand that, but then the main things he relies on, as I recall, are he relies on the fact that Detective Watts was in the room. Detective Watts, there's an implication that Detective Watts said we're going to get this guy or something like that that influenced Dr. Fatak in his examination and conclusions, that Dr. Fatak's evidence was the critical evidence that went before the grand jury and then before the jury in the first trial, and that Dr. Fatak's evidence for those reasons was concocted and false. I mean, there's not much more meat in Judge Bennett's analysis. But we're not here to critique Judge Bennett. I mean, obviously, if you have these facts, you have these facts. But let me ask you the other biggest question, and, you know, I'll take your word for it, and we'll look very closely at the record. My other big, big question is how could Judge Bennett reconcile this criticism of Dr. Fatak when he lets Detective Watts off the hook? Well, I wish he could not let Detective Watters off the hook, but obviously it's a different legal standard. It's a different legal standard for the police officer than it is for him. Not really. That's the whole point. It's not a different legal standard. Well, except that Detective – ironically, the argument for Detective Watters to get off was the fact that Dr. Fatak found it to be a murder, and ergo the chain, just as they're arguing now about a grand jury, was broken. And so we shouldn't be able to get to Detective Watters because Dr. Fatak was supposed to be the thin blue line, if you will, between him and righteousness. But you're saying that this all started with Detective Watters saying black women don't commit suicide, which is a very – a statement I had never heard before this morning. And so he had it in his mind that Dean was guilty. And he put everything together, notwithstanding counter-testimony by the neighbor or whatever, you know, Dean's explanation of things and so forth. So Fatak would have had no motive to get Dean unless Watters had said he's the guy, right? Well, that's exactly what did happen, yes. Yes. But Detective – I mean Judge Bennett lets Watters off the hook. I thought it was very mysterious. I wouldn't presume to ever. Trust me, Judge, I'd have rather won on the other one too. But the argument being made that Judge Bennett agreed with was the break in the causation by the fact that Mr. Fatak, Dr. Fatak, came in and said it all comes down to gun up or gun down. And it was gun down – gun up, so it's not a suicide. And that's how they – that was their argument about Detective Watters, and the judge agreed with that. Going back to the question of whether there's sufficient – truly a genuine issue of fact here, we asked the question of whether or not there's sufficient evidence that a juror could find that he deliberately – that he lied and he deliberately lied. I think we're all on the same page on that. My question, what is the evidence of why he would do so? I mean you infer that it's sort of to help Watters or whatever. Watters, you had a detective pressing to get close to the case and so forth to accommodate. That sounds pretty thin to me, that a doctor would just try to accommodate somebody. It's a good – it is a big step from missing the facts to say that you did it deliberately when the question is whether somebody is going to be punished. Right, and I don't disagree with that, Judge. But that's where it really comes down to. The general judge said, well, there's a fact issue, and he's going to let it go forward. And immunity turns on that, et cetera, et cetera. But is it there? I mean, is that a fair – what is there to support the – I don't understand why a doctor would deliberately do that. He just may be terribly negligent. He may have had some kind of a racist component to it in the sense that he didn't pay a lot of attention to it. We've seen that in this misdemeanor murder mindset out there. It's just black folk. I mean, I don't know what's going on here, but the question here is what the – is this a big step up? And I don't know what's there. I don't think it's something I have to prove, but if you want my – Well, the jury has got to conclude that – Well, yes, and Judge Bennett obviously looked at it in making the determination on the summary judgment. But I'm asking you, what's that based on? It's based on the fact that it was so obvious that the gun was in the suicide position versus the other position. It's based on he does the vitreous fluid instead of blood alcohol. It's based on his many inconsistencies at the second trial. Just for the sake of argument, how do you explain that she had no blood on her hands or gun residue? Shannon did not? Unlike what counsel said, the gunshot residue tests were inconclusive on both Shannon and Mr. Dean. And if you're asking me why, it's because it's a contact wound. All the stippling goes into the brain, and there's no blood coming out. It's coming out the other side. I just assumed it blew the top off one's head. No, ma'am. In fact, the angle of the entry was what you would expect if someone's laying on the floor doing a suicide, which is comes in here at the temple and exits higher on the backside. Well, it actually went through the bathroom wall. So she would not have blood, nor would she have stippling. It would all be internal. Was that what Dr. Carter testified on the first trial or what? Dr. Carter testified on the first trial. She was explaining why there would not be stippling and why there would not be blood, yes. Yes, she did. The falsity of this, the inference of falsity stems from the fact that it encouraged us to think that it was suicide given the physical facts themselves. But if those are sources of patent that you're going to infer falsity out of it, it's hard to see how this case got off the ground. Which the original prosecution, they relied almost exclusively on – This is pretty strong circumstantial evidence. He wore a gun at the party. He then – No, Your Honor. That's the way we read it, that he had a gun in his waistband, and someone from the party – I'm not making this up. Someone from the party testified that he said he had it there unless somebody unwanted showed up at the party. At one point earlier in the evening, the gun – In that very evening. Then he goes off for an hour and takes his friend home. There's a question about where the gun was. The friend said the gun was in the laundry room next to the garage. Dean said he put it in the top drawer of the dresser, right accessible to his wife who was suicidal, I might add, in certain circumstances. Then he goes and looks at the text messages between her and her boyfriend. He gets angry. They've already been quarreling. They know that they are quarreling about it. She freaks out. Then the argument is did he try to get into the bathroom to save her or did he go in the bathroom to kill her? One of the examining officers on the scene says it couldn't possibly have been the way he describes it because there was this heavy purse hanging on the door. I mean it's circumstantially very suspicious, and I'm not – But the fact is – The jury said what the jury said. Well, actually, the prosecutors dismissed it. Well, and that's where I'm headed. If the report wasn't critical, then it's hard to explain how immediately upon the undermining of that report at the second trial, the charges are dismissed. Nothing else had changed except that report got undermined. Exactly, and Dr. Wolf testified to exactly that. He's the one who did the side-by-side, and it's contained within his deposition testimony, which is part of this record and was before the trial court, that – Correct. It was not an incidental piece of evidence, Judge. It was the critical piece of evidence because otherwise the report would have said it was a suicide and there would have been no prosecution. Did your client testify at the first trial? No, ma'am. Did he testify at the second trial? They never got there. They were still in the prosecution case. Oh, right, yes. And that's an important fact. Dr. Fatak was being cross-examined by a very good defense trial lawyer in the second trial named Letitia Quinones, and she was demonstrating how off-base he was. Prosecutors took a break, went to Dr. Wolf, and this is all in Dr. Wolf's deposition, and said, Will you do this side-by-side comparison for us? In an hour, he comes back and says, This is a suicide. This is gunned down. And that – prosecutors dropped the case. Now, with regard to expungement, they still had the record. In fact, it's part of the order that they get to keep the record because they knew a civil suit was likely coming. So it was expunged so no one else could get access to it, but not so for the DA's office. It becomes obvious after a side-by-side comparison, but only when the side-by-side comparison, that proves to be definitive. I guess a lot of things become obvious after the truth is discovered. So are you going to have an expert witness that testifies that side-by-side comparison is the standard of care? I'm going to have an expert witness who will testify that if the sole basis for your decision is whether that handle is up or down, then yes. You need to get the gun and compare it to the wound, not just go, I've seen a gun like that before, and I've seen this wound, and I'm going to tell you that this was handle up. That's not how you do it if that's the sole basis for your determination. Well, it wasn't the sole basis because, again, there was a gun residue. You say that was inconclusive, but you do have the other business about blood splatter and all that kind of stuff. I understand, Judge, and we could go around and argue it all day long on what other facts are, and I expect at trial I'm going to have to do that, except Dr. Fatak himself said handle up or handle down to determine the case. He said that clearly twice in his deposition. They tried to rehab him in the depot to say, well, you considered this, that, and everything else under the sun. He said, sure, sure, sure, sure, sure. I took him back in his depot and said, but it was handle up or handle down. That's what decided the whole thing. He said yes. Detective Waters said the exact same thing to Noel when he was berating him in this noncustodial interrogation. So if Dr. Fatak is so dishonest that he intentionally fabricated this evidence, why did he say that in the deposition then? Because by then he concedes his liability. Are you saying that? Well, he didn't say I did it on purpose, obviously. But, no, I mean in his deposition he said it because it had already come out at the second trial, which was well before I deposed him, that Dr. Wolfe had done the side-by-side comparison and said this is a handle down case. She was holding the gun at the time of the discharge. And Dr. Fatak wasn't going to buck Dr. Wolfe, and he agreed with that once he saw the pictures. And the whole process, Judge, took an hour. This man's life was disrupted for three years. It took an hour, which it would have taken ten minutes at the actual autopsy to get the gun and compare it to the wounds. The counsel in the first trial would have cried this out and probably through Dr. Carter, too. So don't entirely blame the ‑‑ I mean, obviously there was at least incompetence, but don't entirely say this was a concocted error. I guess he had malpractice coverage unless it was an intentional act. Well, there won't be any. There's no coverage for an intentional act, but he's under the county's umbrella anyway, Judge. He's under the county umbrella anyway, so he's got all those protections and immunities. All right, sir. Thank you very much. Thank you. If you want to give us any record citations to what you've been telling us, it would help us out. May I submit that by letter? Yes, sir.  I appreciate the court's ‑‑ may I proceed, Your Honor? Sure. Thank you. Didn't want to interrupt you. Sorry about that. Yes. I appreciate the court's invitation to counsel to submit actual record cites because I'm deeply concerned that some of the statements take license with the actual record. To be sure, in the appellee's briefing, there is simply no record citation which substantiates the assertion that Dr. Faddock said his medical judgment of homicide versus suicide turned solely and only upon the position of the gun. And I don't think that in following Judge Jones's invitation that counsel can present that. I should point out that equally Dr. Wolf never testified that it was obvious to him that the gun position was wrong, but rather that it became clear to him after doing the side-by-side comparison. I don't know what Detective Waters supposedly said to the appellee, but I do ‑‑ if it's true, then Detective Waters started with a bias of his own investigation, which is clearly improper, but appellee's counsel's attempt to reconcile in response to Judge Jones's question the dismissal of Detective Waters without the dismissal of Dr. Faddock is incorrect in that Judge Bennett did not dismiss Detective Waters because he found or fixed liability upon Dr. Faddock. He, Judge Bennett, dismissed Detective Waters under Quadra, which counsel essentially alluded to, which is the break in the chain of causation. And under Quadra, not only should this Court find no constitutional violation because of that break at the grand jury in the absence of record evidence showing the grand jury considered it, but even if it's there, the precedent of this Court holds that the Court then must determine whether in the absence of that would there still be probable cause to support the grand jury's indictment. And Judge Jones's recitation of the facts indeed is borne out by the record, and because time doesn't allow it, I would point out that those record citations are clear within pages 16 through 19 of the appellant's brief. And as to the gunshot residue, Your Honor, I'll focus on that specifically. At record 3762, the appellee's criminal defense counsel acknowledged that Mr. Dean's T-shirt tested positive for gunshot residue, but simply that she was successful in seeking and obtaining an order excluding that from evidence in the first criminal trial. There's nothing inconclusive about the findings of gunshot residue on Mr. Dean's hands. I'm sorry, on Mr. Dean's clothing. On his hands, he admitted to the detectives that he washed his hands after the incident and before the police arrived. But there was gunshot residue found on a T-shirt, which he had changed out of after the shooting and before the police arrived. You said he washed his hands and changed. Where's the record citation on that? Those will be in, if you can allow me, Judge, I can tell you it's in the brief between pages 16 and 19. No, no, no, the record citation. They're listed in pages 16 through 19 of the brief. And the fact that the gunshot residue was on his T-shirt is also there. That's record 3762. And record 4178 is Mr. Dean's admission that he changed his T-shirt before the police arrived. But to the broader two points of qualified immunity and the limited time I have left, let me just offer two observations. In Brewer, Judge Higginbotham wrote about the, quote, unquote, science of odontics, which the Court acknowledged was in serious question at the time that that dental expert utilized it. And the Court said, however, because it was still available and recognized as a potential use for criminal investigation, it was appropriate for the doctor to use it. Here, in contrast, the Court has no evidence from any source that a side-by-side comparison was required. In fact, the AMECI, including the American Medical Association, tells this Court there is no standard of care that requires that. Dr. Wolfe and Dr. Sanchez also submitted affidavits saying the very same thing. There's simply no standard that requires that. Lastly, this could not be a matter of clearly established law. Brewer, as of June, said medical, errors in medical judgment do not violate the Constitution. I'm having a problem with you talking about whether or not a side-by-side was required when I thought we were talking about whether or not he created a false report. It may have created a mistakenly inaccurate report, but there's absolutely no evidence, Judge Graves, that it created a knowingly false report. And after all, that's the test. There's no evidence in this record. Mr. Gallo is very eloquent. But if it was required, would that help me get to the conclusion that he created a false report? I just don't understand why that's so important, whether or not it was required. I think it would, Your Honor. I think it would. It certainly moves Your Honor closer to that resolution. It's more like a ground case. Yes, exactly. I mean, a deviation from a recognized and accepted standard of care would at least allow what Apelli's counsel is suggesting, which is some inference of an attempt to do something other than what medical standards require. But in complying with medical standards, and looking at this Court's case in the critical Court's opinion in Brewer, and looking at what the district courts have said based upon Brewer, in the absence of a medical standard, medical negligence simply does not reach the level of a constitutional violation. And if it does, this Court should enunciate that fact now, but it still must allow my client the presumption of the immunity to which he's entitled. Thank you. And thank you for the additional time. All righty. Thank you.